Adam D. Brumm, Esq.  SB#257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email: adam@edendefenders.org

Attorneys for Plaintiff
CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, a California limited liability company, <br><br>        Plaintiff, <br><br>    vs. <br><br> BARBOSA CABINETS, INC., a California corporation; REPUBLIC ELITE, LLC, a Delaware Limited Liability Company PROLOGIS, INC., a Maryland corporation; PROLOGIS, L.P., a Delaware Limited Partnership;, and DOES 1-10, inclusive, <br><br>        Defendants. | Case No.: <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION** |

Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC

("EDEN" or "Plaintiff") hereby brings this civil action pursuant to the Federal Clean Water Act

("CWA"), 33 U.S.C. §§ 1251 and 1365, *et seq*.

## I.    <u>INTRODUCTION</u>

1.    This action is a citizen suit for injunctive relief, declaratory relief, civil penalties,

and remediation against Defendants BARBOSA CABINETS, INC., REPUBLIC ELITE, LLC,

PROLOGIS, INC. and PROLOGIS, L.P. ("Defendants") for current and ongoing violations of

the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

**Notice Letter**

2.      On or about July 26, 2025, EDEN provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants, including a copy delivered to Defendants by certified mail, to Facility Manager, Barbosa Cabinets, 2020 E Grant Line Road, Tracy, California ("Defendants' facility" or "the Facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.      A copy of Plaintiff's Notice of Intent to Sue ("Notice") is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.      More than sixty days have passed since Plaintiff's Notice was properly and lawfully served on Defendants, the State Board, and the Regional and National EPA Administrators.

5.      Plaintiff is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

6.      This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## II. PARTIES

**Plaintiff**

7.      Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS is an environmental membership group organized under the laws of the State of California.

**Defendants**

8.     Defendant BARBOSA CABINETS, INC., doing business as Barbosa Cabinets, located at 2020 E Grant Line Road, in Tracy, California, is a California corporation in good standing with the California Secretary of State.

9.     Defendant Barbosa Cabinets, Inc. is identified in the Regional Water Board's records as the Industrial General Permit applicant and operator of the Facility.

10.     Defendant REPUBLIC ELITE, LLC is a Delaware limited liability company in good standing with the Delaware Secretary of State.

11.     Defendant REPUBLIC ELITE, LLC is the parent company of Barbosa Cabinets and is a co-operator of the Facility.

12.     Defendant PROLOGIS, L.P. is a Delaware limited partnership in good standing with the Delaware Secretary of State which is registered as a foreign entity with the California Secretary of State to do business within the state of California.

13.     Defendant PROLOGIS, INC. is a Maryland corporation in good standing with the Maryland Secretary of State which is registered as a foreign entity with the California Secretary of State to do business within the state of California.

14.     Defendants PROLOGIS, L.P. and PROLOGIS, INC. are the legal owners of the property on which the Facility operates.  Prologis, L.P. is wholly owned by Prologis, Inc., its general partner.

### III.  JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

16.     Venue is proper because Defendants reside in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

## IV.   ARTICLE III STANDING

17.     Plaintiff is an environmental membership organization with active voluntary associational members who reside in northern California, as confirmed by documents on file with the California Secretary of State.

18.     Plaintiff has multiple identifiable associational members in northern California, as confirmed by public records.

19.     Plaintiff's status as a sole managing member limited liability company (as opposed to a non-profit corporation) is irrelevant to whether it has standing to bring this suit and is not dispositive of its ability to maintain its active associational members.

20.     Plaintiff's organizational purpose and mission is the protection, preservation and enhancement of the navigable rivers, lakes and oceans (and their tributaries) physically located in northern California.

21.     Plaintiff's organizational purpose and mission is accomplished through enforcement of the provisions of the CWA and California's Industrial General Permit, by seeking redress against industrial businesses located in northern California who violate the CWA and fail to comply with all standard conditions of California's Industrial General NPDES Permit ("General Permit").

22.     The filing of this complaint is germane to Plaintiff's organizational purpose and mission.

23.     Violations of the standard conditions of the General Permit are actionable by citizens under the CWA pursuant to 33 U.S.C. section 1365(f)(7).

24.     A subset of EDEN's current and identifiable associational members reside, work and/or recreate near the Southern Portion of the Delta Waterways, including Old River, a permanent, continuously flowing body of water which has an adjacent surface connection to the San Joaquin River, a navigable Water of the United States which is part of the Sacramento-San Joaquin River Delta ("the affected waterways"), and use those waters and their watersheds for kayaking, canoeing, cycling, recreation, sportfishing, swimming, hiking, bird watching, photography and nature walks.  Their use and enjoyment of the affected waterways has been and continues to be adversely impaired by Defendants' failure to comply with the procedural and substantive requirements of the Industrial General Permit and the CWA.

25.     A subset of EDEN's current and identifiable associational members described above are all persons for whom the aesthetic and recreational value of the affected waterways has been diminished and/or impaired on an ongoing and continuous basis as a direct result of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein.

26.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who are aware of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein.

27.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who believe that Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein, have directly contributed to (a) degradation of the affected waterways downstream from the Facility; (b) injury to, deformation and toxicity of the aquatic life in the affected waterways; and (c) a reduction in the number of birds and other wildlife existing in the area.

28.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who intend to return to the affected waterways to recreate, albeit with a diminished desire and aesthetic enjoyment, directly attributable to

Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein.

29.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who no longer wish to immerse any part of their body in the portion of the affected waterways downstream from Defendants' facility because of their awareness of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility as described herein, their belief that Defendants' ongoing violations proximately caused or contributed to degradation of water quality in the affected waterways since at least December 6, 2021, and continuing to the present, and concerns over potential adverse health effects caused by bodily contact with the affected waterways.

30.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who no longer wish to consume any fish caught from the affected waterways because of their awareness of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein, their belief that Defendants' ongoing violations proximately caused or contributed to degradation of the River since at least December 6, 2021, and continuing to the present, and concerns over potential adverse health effects of consuming fish caught from the affected waterways.

31.     A subset of Plaintiff's current and identifiable associational members described in the paragraphs above are all persons who have experienced informational injuries directly resulting from Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, since at least December 6, 2021, and continuing to the present, as described herein.

32.     The informational injuries sustained by Plaintiff's current and identifiable associational members as described in the paragraphs above constitute a deprivation of the rights of the referenced persons to obtain complete and accurate information regarding Defendants' compliance with standard conditions of the General Permit at the Facility, which provisions have

been instituted by relevant regulatory agencies for the purposes of protecting the Waters of the United States.

33.     One of the most important standard conditions of the General Permit is monitoring and reporting, which is comprised of multiple separate requirements.

34.     The first step requires industrial businesses covered by the General Permit ("Permittees") identify in their Storm Water Pollution Prevention Plan ("SWPPP") all industrial materials and chemicals present at their facility.  For each industrial material/chemical identified, the Permittee is required to designate an indicator parameter as an additional sampling parameter if the material in question has any potential to commingle with storm water.  This ensures that Permittees are testing their storm water for all potential constituents likely to be present in their storm water runoff.

35.     The next step is to designate locations for collecting storm water samples which are representative of industrial activity.  This means that a Permittee must collect storm water samples from areas of their facility that are likely to show the presence of industrial materials and chemicals from outdoor industrial activities conducted by the Permittee.

36.     The General Permit requires Permittees to segregate their facility into separate drainage areas, defined by the direction of storm water flowing to a common area.  Storm water encompasses both surface flow (above ground) and precipitation falling on the facility that enters drain inlets and flows through underground conveyances.  Drainage areas are also dependent on the layout of facility in terms of the location of buildings, structures, ground elevations, grading and storm water conveyances.

37.     The Permittee is then required to designate at least one representative storm water sampling location for each of the segregated drainage areas.

38.     Defendants' facility handles numerous types of chemicals and industrial materials which are associated with the following toxic substances:  Iron, Aluminum, Silica, Formaldehyde, Volatile Organic Compounds (VOCs), Lead, Zinc, Chromium, Chloride,

Biological Oxygen Demand (BOD), Diazinon, Sulfur, Zinc, Nitrates, Ammonia, Benzene, Xylene, Styrene, Arsenic and Lead.

39.    As described in this complaint and the attached Notice, to date Defendants have not yet conducted an adequate sampling parameter assessment for the Facility and have not segregated the Facility into separate drainage areas and depicted those drainage areas on the Facility's Site Map.

40.    Since December 6, 2021, and continuing to the present, Defendants have not collected storm water from all required areas of the Facility and have not tested the Facility's storm water for all required sampling parameters.

41.    In addition, Defendants' housekeeping practices at the Facility are extremely deficient on an ongoing and continuous basis and include allowing toxic chemicals and industrial materials to enter onsite storm drains which flow into the affected waterways; failing to clean up spills of toxic industrial materials; maintaining uncovered waste bins; significant excess outdoor storage of scrap and industrial materials, and significant staining on the ground from industrial materials and chemicals, as well as other deficiencies which are detailed in the attached Notice.

42.    Another standard condition of the General Permit is that all Permittees must upload to the SMARTS publicly accessible database system all storm water sampling analytical data, SWPPPs and Site Maps, Annual Reports and other required documents.

43.    The purpose of this requirement is to allow the general public to assist the regulatory agencies with monitoring Permittees' compliance with the standard conditions of the General Permit.

44.    The General Permit also requires Defendants' designated legally responsible person or duly authorized representative to certify under penalty of law that every document uploaded to SMARTS is true, correct and complete.

45.    Defendants' representatives have uploaded and certified documents to SMARTS which contain objectively false information, including Annual Reports which provide false explanations for Defendants' failure to collect storm water samples at the Facility; and false and

deficient SWPPPs which include objectively false information related to drainage, storm water flow, drain inlets, mandatory sampling locations, industrial materials handled at the Facility, and storm water flow/sampling locations.

46.     As a result of Defendants' intentional misrepresentations as articulated above, Defendants have since December 6, 2021, and continuing to the present, avoided the mandatory responsibility pursuant to the CWA and General Permit of testing the Facility's storm water for all industrial materials and chemicals handled at the Facility which could potentially come into contact with storm water, in violation of the standard conditions of the General Permit.

47.     As a result of Defendants' intentional misrepresentations as articulated above, Defendants have since December 6, 2021, and continuing to the present, avoided the mandatory responsibility pursuant to the CWA and General Permit of collecting storm water from all required sampling locations present at the Facility, in violation of the standard conditions of the General Permit.

48.     Defendants' failure to comply with the standard conditions of the General Permit as set forth above have prevented Plaintiff's associational members referred to in the paragraphs above from: (a) accessing on SMARTS the true operational facts relevant to Defendants' facility; and (b) acquiring accurate and complete data related to the unmonitored substances emanating from Defendants' facility during rain events.

49.     As such, Plaintiff's current and identifiable associational members referred to in the paragraphs above are unable to fully assess the extent of the General Permit violations at the facility, as well as the types and levels of industrial materials entering the affected waterways, due to Defendants' willful violations of the standard conditions of the General Permit at the Facility; or to gauge the potential health ramifications to themselves should they continue to recreate in the affected waterways.

50.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above have been members of EDEN since at least the date of Plaintiff's Notice to Defendants.

51.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are individuals who have all experienced an ongoing, continuous, concrete, personal, specific, actual or imminent, non-speculative injury-in-fact commencing on and after December 6, 2021, and continuing to the present, arising directly from Defendants' failure to comply with the standard conditions of the General Permit at the Facility, as articulated herein.

52.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who would have standing to file this suit by themselves as individual plaintiffs.

53.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs  above are all persons who will not be required to personally participate in this lawsuit, except for the member(s) who have agreed to be identified for purposes of standing. Plaintiff will disclose the identities of those member(s) to Defendants in Plaintiff's Initial Disclosures, pursuant to the requirements of Federal Rule of Civil Procedure 26.

54.    The ongoing and continuous injuries sustained by the subset of EDEN's current and identifiable associational members described in the foregoing paragraphs will be adequately redressed by a judicial decision in this matter granting Plaintiff the injunctive relief requested herein.

55.    Defendants do not need to know the identity of any of Plaintiff's current and identifiable associational members described in the paragraphs above to understand and respond to this Complaint.

## V. <u>STATUTORY BACKGROUND</u>

56.    Congress declared that the Federal Clean Water Act was designed to restore and maintain the chemical, physical, and biological integrity of the Nation's waters through federal and state cooperation to develop and implement programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters. 33 U.S.C. §§ 1251(a), 1252(a)

57.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to Permittees or through the issuance of a single, statewide general permit applicable to all industrial storm water Permittees. 33 U.S.C. § 1342(p)

58.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board to issue NPDES permits, including general NPDES permits in California.

Citizen Suit Provision of the CWA

59.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of any standard condition of any NPDES Permit.

60.     No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation to: (i) the Administrator of the EPA; (ii) the State in which the alleged violation occurs; and (iii) any alleged violator of the standard, limitation, or order. 33 U.S.C. § 1365(b)(1)(A)

61.     By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

62.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the District Court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a).   Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192.00 per day for each violation occurring before November 2, 2015, $56,460.00 per day per violation for violations occurring after November 2, 2015; and $57,617.00 per day per violation, for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI(Q(1)

63.     Violations of the standard provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4

**A. General Permit**

64.     The California Water Board elected to issue a statewide General Permit for industrial storm water discharges.   Thus, the Permit under which this case arises is a federally required permit based upon California state substantive law.  *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5[th] 749 (2016)

65.     The Water Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The Permit was reissued on April 17, 1997, and again on April 1, 2014 ("General Permit"), pursuant to Section 402(p) of the Clean Water Act. 33 U.S.C. § 1342(p)

66.     The current General Permit went into effect on July 1, 2015, after which it was amended again on November 6, 2018, with the revisions becoming effective on July 1, 2020. [See California's Industrial General Permit, Order WQ 2014-0057-DWQ, as amended by Order WQ 2015-0122-DWQ and Order WQ 2018-0028-DWQ, which is fully incorporated herein by reference.]

67.     A complete copy of the current General Permit Order is accessible at https://www.waterboards.ca.gov/water_issues/programs/storm_water/igp_20140057dwq.html

68.     All industrial facilities located in California having the potential to discharge storm water associated with industrial activity which have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing Permit Registration Documents, including a Permit Application, and an initial SWPPP and Site Map.

69.     The specific industrial facilities required to apply for General Permit coverage are identified on Attachment A to the General Permit.

1.  **SMARTS Compliance Database**

70.    The Water Board has established an online database referred to as its Stormwater Multiple Application and Tracking System (SMARTS").  SMARTS is a platform where Permittees enter and manage storm water data associated with General Permit compliance.

71.    SMARTS is readily accessible by the general public on the web; and the system is maintained primarily for the purpose of providing public access to allow citizens to monitor Permittees' compliance with the General Permit and to pursue Permittees who fail to comply, utilizing the citizen's suit provision of the CWA.

72.    SMARTS can be accessed at California Stormwater Multiple Applications and Report Tracking System.

73.    The General Permit requires Permittees to certify (under penalty of law) and submit to SMARTS all Permit Registration Documents, including Permit Applications, SWPPPs and Site Maps; monitoring and sampling data, Exceedance Response Reports and Annual Reports.  General Permit §§ I(A)(17), II(A)(1), II(B)(1), II(D), XI(B)(11)(a), XXI(K), XXI(L), Attachment D.

2.  **Standard Conditions of the General Permit**

74.    The General Permit contains a variety of substantive and procedural standard conditions.

75.    The General Permit requires that Permittees comply with all standard conditions of the Permit and indicates that failure to comply with any standard condition of the General Permit constitutes an actionable, per se violation of the CWA, which comports with the provisions of 33 U.S.C. §1365(f)(7).  General Permit § XXI(A)

76.    The primary standard conditions of the General Permit include the following:

(a)    Continuously maintaining an accurate, up-to-date and compliant *SWPPP and Site Map*; implementing all provisions of the SWPPP, and certifying and submitting the SWPPP to SMARTS;

(b)    Implementing and maintaining *Best Management Practices* ("BMPs");

(c)     Conducting monthly and sampling event *visual observations*, contemporaneously completing observation reports and maintaining the reports for five years;

(d)     Collecting and analyzing *storm water runoff samples* four times per year;

(e)     Collecting the *storm water samples during qualified storm events, from all required sampling locations, in all drainage areas* in places which are representative of industrial operations;

(f)     Testing the collected storm water samples for *all required parameters,* using the correct EPA test methods, and the prescribed sample holding times; and reporting the results to the Water Board within 30 days by certifying and submitting them to SMARTS;

(g)     Conducting *Annual Facility Compliance Evaluations* and contemporaneously preparing and retaining evaluation reports;

(h)     Preparing complete and accurate *Annual Reports* and certifying and submitting them to SMARTS; and

(j)     Establishing an onsite compliance Team of at least two employees and ensuring that the Team remains fully trained on all aspects of compliance with the General Permit.

<u>SWPPP and Site Map Requirements</u>

77.     All Permittees are required to develop and implement a SWPPP.

78.     The main objective of the SWPPP requirement is to identify and evaluate sources of industrial materials and chemicals associated with industrial activities that may affect the quality of storm water runoff from the Permittee's facility, and to implement best management practices ("BMPs") to reduce or prevent materials associated with industrial activities in storm water runoff emanating from the Permittee's facility.  General Permit § X(C).

79.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised within ninety (90) days when there are routine revisions to be made; and within thirty (30) days whenever the SWPPP requires significant revisions. General Permit § X(B)

80.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP when necessary, is a violation of the General Permit. General Permit §§ I(J)(68), II(B)(3)(a), X(A), X(B), General Permit Fact Sheet § I(1)

81.     Among other requirements, the SWPPP must include: a detailed description of the facility's industrial processes and operations; identification of an onsite compliance Team; a site map; a list of industrial materials handled and stored at the site, including the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency; a discussion of whether industrial materials or chemicals have the potential to commingle with storm water;  a monitoring implementation plan, including a discussion of facility drainage, drainage areas, and sampling locations; all mandatory sampling parameters; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent industrial materials in storm water runoff. General Permit §§ X(A)-X(I)

82.     The General Permit also requires that SWPPPs include detailed BMP Descriptions and a BMP Summary Table.  General Permit § X(H)(4), (5)

83.     Site Maps are required to depict the following: the facility boundary, storm water drainage areas, storm water flow direction, on-site surface water bodies and/or locations of nearby water bodies, municipal storm drain inlets that receive storm water from the facility, locations of storm water collection and conveyance systems, associated sampling locations, locations and descriptions of structural control measures, identification of all impervious areas, locations where materials are directly exposed to precipitation, locations where significant spills or leaks have occurred, and all areas of industrial activity, including industrial storage areas. General Permit § X(E)

Best Management Practices

84.     The General Permit requires all Permittees to implement and maintain the following minimum Best Management Practices: Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion

and Sediment Controls, Employee Training Program, and Quality Assurance and Record Keeping.   General Permit § X(H)(1)

85.    The General Permit further requires Permittees to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs if necessary: exposure minimization BMPs, storm water containment BMPs, treatment control BMPs, and other advanced BMPs.  General Permit § X(H)(2)

86.    Failure to implement minimum and advanced BMPs as necessary is a violation of the General Permit. General Permit Fact Sheet §I(I)(2)(o)

<u>Monitoring and Reporting/Storm Water Sampling and Analysis</u>

87.    The General Permit requires Permittees to develop and implement an adequate Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of industrial materials in a facility's storm water runoff to ensure compliance with the General Permit.

88.    As part of their monitoring program, Permittees must identify all required storm water sampling locations and evaluate the effectiveness of BMP .

89.    Section XI(B) of the General Permit requires that Permittees collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the facility SWPPP.

90.    A QSE is a precipitation event that produces measurable precipitation for at least one drainage area and is preceded by 48 hours with no measurable precipitation in any drainage area.  General Permit §XI(B)(2)

91.    Once the storm water samples have been collected, the General Permit requires that Permittee's must deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload to SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit §§ XI(B)(8), XI(B)(11)

92.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, all additional parameters indicated in the Permit by facility type (standard industrial classification code), and all parameters identified by the Permittee on a facility-specific basis.  General Permit § XI(B)(6)(c)

93.     Facilities are also required to conduct monthly and sampling event visual observations.   Monthly visual observations must be conducted during daylight hours on days without precipitation and must include observing each drainage area; as well as inspecting outdoor industrial equipment and storage areas, outdoor industrial activities areas, and monitoring BMPs for effectiveness.  Sampling event visual observations are conducted at the same time as sampling occurs and must include observing storm water runoff for the presence or absence of floating and suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris.  General Permit § XI(A)

Annual Comprehensive Facility Evaluation

94.     The General Permit requires Permittees to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  General Permit § XV

Annual Reports

95.     Section XVI(A) of the General Permit requires all Permittees to certify and submit to SMARTS an Annual Report no later than July 15th following each reporting year.

96.     Annual Reports are auto populated by SMARTS from Permittees' answers to a series of twelve questions, which require mostly yes/no responses.

97.     The questions include whether the Permittee has conducted monthly visual observations, collected and analyzed the required number of storm water samples from all required sampling locations at its facility; and where the facility is located within an impaired watershed, the Permittee has assessed whether any of the receiving water impairments are present at their facility.

98.    Any "no" responses to the above questions require a complete and accurate explanation, certified under penalty of law.

<u>Certification of Compliance Documents</u>

99.    Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a Legally Responsible Party (LRP) or Duly Authorized Representative (DAR) of the facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

## VI.    SPECIFIC FACTUAL ALLEGATIONS

### A.    The Facility

100.    Barbosa Cabinets, located at 2020 E Grant Line Road in Tracy, California, is a facility which manufactures wooden cabinets, engineered kitchen countertops and stone countertops.

101.    Plaintiff is informed and believes that the facility falls under standard industrial classification ("SIC") code 2434-Wood kitchen cabinets, based on public records.

102.    SIC Code 2434 is included in Attachment A of the General Permit as a type of industrial operation that requires application for and receipt of General Permit coverage.

103.    Based on the foregoing, Plaintiff alleges that Defendants are required to maintain standard General Permit coverage and are not eligible to apply for or receive either No Exposure Certification (NEC coverage) or Notice of Non-Applicability (NONA coverage).

### C.  **Defendants' General Permit Violations**

Deficient SWPPP/Failure to Follow SWPPP

104.    Since at least December 6, 2021, Defendants have failed to implement an adequate SWPPP for the Facility and have failed to comply with the terms of the Facility's deficient SWPPP, in violation of the standard conditions of the General Permit.   General Permit §§ I(J), II(A)(1), II(B)(1)(b), II(B)(3), X, XXI(A), XXI(K)(1), XXI(L); General Permit Fact Sheet § II(I)(1); 33 U.S.C. § 1365(f)(7)

105.    Defendants' continuing failure to implement and follow an adequate SWPPP is evidenced by documents uploaded and certified to SMARTS under penalty of law by Barbosa Cabinets, as well as by required documents which have not been uploaded to SMARTS.

106.    Defendants' continuing failure to implement an adequate SWPPP is also evidenced by eyewitness reports and inspections conducted by representatives of Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies.

107.    As is more particularly described in **Exhibit A**, attached hereto and incorporated herein by reference, Plaintiff's Notice issued to Defendants on July 26, 2025, delineated numerous deficiencies in Defendants' SWPPPs and Site Maps certified and submitted to SMARTS on November 30, 2021; September 6, 2022; and July 11, 2023.

108.    The 60-day notice period on Plaintiff's Notice expired on September 24, 2025, without correction of the violations alleged in Plaintiff's Notice, including preparation of a revised SWPPP.

109.    Defendants' current SWPPP and Site Map remain deficient for failure to include the following:  (a) complete and accurate Industrial Material Inventory List and discussion of onsite industrial materials/chemicals likely to commingle with storm water [violation of General Permit §§ X(F), X(G) and XI(B)(6)]; (b) all mandatory sampling parameters [violation of General Permit § XI(B)(6)]; (c) sufficient detail regarding Facility operations and industrial processes [violation of General Permit § X(G)(1)]; and (d) accurate discussion and depiction of

Facility drainage and all mandatory sampling locations [violation of General Permit §§ X(I) and X(G)(1)(e)].

110.    Defendants' SWPPP and Site Map do not include sufficient information to comply with the mandatory elements required by Section X of the General Permit, as is more particularly described in the Notice attached hereto as **Exhibit A**.

111.    Defendants' current SWPPP has not been revised as required by the General Permit to reflect true conditions at the Facility.

112.    Defendants' current SWPPP and Site Map contains misleading, false or insufficient information regarding facility operations and processes; drainage, drainage areas and storm water flow; mandatory sampling points; the type, amount and location of industrial materials and chemicals handled at the Facility; and all mandatory required sampling parameters associated with the facility's industrial materials and chemicals.

113.    Defendants have failed and continue to fail to alter the Facility's SWPPP/Site Map and site-specific BMPs to comply with the requirements of the General Permit.

114.    In addition, Defendants have failed to comply with the provisions of the Facility's current SWPPP in the areas of monitoring and reporting.

115.    Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged above with respect to Defendants' deficient SWPPP/Site Map are ongoing and continuous.

Monitoring and Reporting/ Storm Water Sampling

116.    Plaintiff alleges that Defendants' monitoring and reporting program at Barbosa Cabinets in Tracy is deficient and in violation of the mandatory standard conditions of the General Permit.  General Permit §§ X, X(I), XI, XXI(A); General Permit Fact Sheet §§ II(I)(3)(a)(iii); 33 U.S.C. § 1365(f)(7)

117.    Defendants' deficient monitoring and reporting program is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendants, as well as by required documents which have not been uploaded to SMARTS.

118.    Defendants' deficient monitoring and reporting program is also evidenced by eyewitness reports and inspections conducted by representatives of Defendants and government agencies, as well as other relevant documents maintained by Defendants and governmental and regulatory agencies.

119.    Since December 6, 2021, Defendants have failed to collect and analyze two storm water samples from the first half of each reporting year, and two storm water samples from the second half of each reporting year, as required by General Permit §XI(B).

120.    In addition, Defendants have failed to conduct monthly visual observations at the Facility since at least December 6, 2021.

121.    Defendants have also collected samples of storm water at the Facility that failed to comply with the General Permit's requirement that samples be preceded by a 48-hour period without precipitation, as is more particularly described in Plaintiff's Notice attached hereto as **Exhibit A**.

122.    Defendants have failed to collect storm water samples from each drainage area at all mandatory sampling locations at the Facility, for each QSE where sampling is performed, pursuant to General Permit § XI(B), as is more particularly described in the Notice attached hereto as **Exhibit A**.

123.    Defendants have failed to analyze the Facility's storm water samples for all required parameters, in violation of Section XI(B)(6) of the General Permit, as is more particularly described in the Notice attached hereto as **Exhibit A**.

124.    Defendants have failed to deliver storm water samples to a qualified Laboratory within 48 hours of collection, pursuant to Attachment H, Section 2 of the General Permit, as is more particularly described in the Notice attached hereto as **Exhibit A**.

                    Falsification of Annual Reports and SWPPPs

125.    Since December 6, 2021, Defendants have submitted inaccurate and falsified Annual Reports and SWPPPs to the Water Board and general public via SMARTS, in violation of the standard conditions of the General Permit, as is more particularly described in the Notice

attached hereto as **Exhibit A** and incorporated herein by reference.  General Permit §§ II(A)(1), XI(A)(C), XVI, XXI(K), XXI(L), XXI(N); General Permit Fact Sheet § II(O); 33 U.S.C. § 1365(f)(7)

126.    Defendants' submission of false Annual Reports and SWPPPs and continuing failure to retract the false statements made to the Water Board and the general public is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendants.

127.    Defendants' submission of false Annual Reports is also evidenced by eyewitness reports and inspections conducted by representatives of Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

128.    Defendants' submission of false statements to the Water Board and the general public is ongoing and continuous.

<u>Failure to Implement Adequate Best Management Practices</u>

129.    Since at least December 6, 2021, Defendants have failed to identify and implement adequate Best Management Practices ("BMPs") at the Facility which comply with the requirements of the General Permit.

130.    Defendants' failure to implement proper minimum BMPs is in violation of the standard conditions of the General Permit.   General Permit §§ I(C), V(A), X, XXI(A); General Permit Fact Sheet §§ II(I)(2)(o); 33 U.S.C. § 1365(f)(7)

131.    Defendants' BMP deficiencies are evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendants, as well as by required documents which have not been uploaded to SMARTS.

132.    Defendants' BMP deficiencies are also evidenced by eyewitness reports and inspections conducted by representatives of Defendants and governmental/regulatory agencies,

as well as other relevant documents maintained by Defendants and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

133.    Defendants' BMP deficiencies are more particularly described in the Notice attached hereto as **Exhibit A** and incorporated herein by reference.

Failure to Train Employees

134.    Since at least December 6, 2021, Defendants have failed to implement and train an onsite compliance Team at the Facility, in violation of the standard conditions of the General Permit.   General Permit §§, I(K)(70), I(K)(77), I(I)(63), IX(A)(3), X(D), XXI(A), 33 U.S.C. 1365(f)(7)

135.    The General Permit requires all Permittees to designate a Legally Responsible Person to implement the requirements of the Permit.  The Legally Responsible Person is responsible for appointing an onsite compliance Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

136.    Defendants' failure to implement and train a compliance Team in violation of the General Permit is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendants, as well as by required documents which have not been uploaded to SMARTS.

137.    Defendants' failure to implement and train an onsite compliance Team in violation of the General Permit is also evidenced by eyewitness reports and inspections conducted by representatives of Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies.

138.    Defendants' failure to implement and train an onsite compliance Team in violation of the General Permit is also evidenced by Defendants' ongoing and continuing General Permit violations.

139.    Other evidence of Defendants' failure to implement and train an onsite compliance Team includes the fact that previously designated Team Members have left the Facility and have been replaced without being trained.

140.    Defendants' failure to implement and train an onsite compliance Team in violation of the General Permit is ongoing and continuous.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

141.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

142.    The General Permit requires Permittees to develop and implement on an ongoing basis an adequate SWPPP, including a detailed and accurate Site Map.

143.    As outlined herein, Defendants have failed to develop and implement an adequate SWPPP for the Facility.

144.    Each day since December 6, 2021, that Defendants have failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

145.     These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop, implement and upload to SMARTS a compliant SWPPP and Site Map.

**SECOND CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

146.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

147.   The General Permit requires Permittees to develop and implement on an ongoing basis a monitoring and reporting program that complies with the terms of the General Permit.

148.   As outlined herein, Defendants have failed to develop and implement an adequate monitoring and reporting program for the Barbosa Cabinets facility.

149.   Each day since at least December 6, 2021, that Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

150.   These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop and implement a compliant monitoring and reporting program.

**THIRD CAUSE OF ACTION**
**Submission of False Documents to the Regional Water Board/SMARTS**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

151.   Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

152.   Section XVI of the General Permit requires that all documents submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L), which provides significant penalties for submitting false information. As delineated herein, Defendants made false representations in the Facility's Annual Reports, Monitoring Reports and SWPPPs and have failed to correct or retract the false statements.

153.   Each time since December 6, 2021, that Defendants have made false or misleading statements in documents submitted to the Water Board via SMARTS under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act. 33 U.S.C. § 1311(a)

154.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' failure to withdraw any of the false and/or incomplete statements submitted to the Water Board.

**FOURTH CAUSE OF ACTION**
**Failure to Implement Appropriate BMPs**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

155.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.  .

156.    As alleged herein, Defendants have failed to properly implement the required Best Management Practices ("BMPs") at the Facility.

157.    Each day since at least December 6, 2021, that Defendants failed to implement the required minimum BMPs in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

158.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop, implement and maintain adequate BMPs at its Facility.

**FIFTH CAUSE OF ACTION**
**Failure to Properly Train Facility Employees**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

159.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

160.    Section X(D)(1) of the General Permit requires each facility to establish an onsite compliance Team responsible for implementing the requirements of the General Permit. The facility is also required to identify alternate Team members to implement the SWPPP and conduct required monitoring when the regularly assigned Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

161.    Section X(H)(f) of the General Permit also requires that Permittees ensure that all Team members implementing the various compliance activities of the General Permit are properly trained.

162.    Since at least December 6, 2021, Defendants have failed to properly implement and train an onsite compliance Team, which has resulted in the General Permit violations alleged herein.  These violations are ongoing and continuous.

### RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.    Declare Defendants to have violated and to be in violation of the CWA;

2.    Issue an injunction ordering Defendants to immediately operate the Barbosa Cabinets facility in compliance with all standard conditions of the General Permit;

3.    Order Defendants to pay civil penalties of $57,617.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

4.    Order Defendants to pay Plaintiff's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and;

5.    Award such other and further relief as may be just and proper.

Dated:  September 25, 2025             Respectfully,


By:  ___/S/  Adam D. Brumm_____
        Adam D. Brumm
        Attorney for Plaintiff

# EXHIBIT A



*Central Valley* **Eden Environmental Defenders**

July 26, 2025

<u>Via US Mail, Certified and Email</u>

Marco Macias          Email:  marco.macias@barcab.com
Facility Manager
Barbosa Cabinets
2020 E Grant Line Road
Tracy, CA 95304

<u>Via US Mail and Email</u>

CT Corporation System
Agent for Barbosa Cabinets, Inc.
330 N. Brand Avenue
Glendale, CA  91203

Deborah K. Briones          Email: dbriones@prologis.com
Prologis
Pier 1 Bay 1
San Francisco, CA 94111

Geoff Bennett          Email: gbennett@republicelite.com
Mark McMahon          Email:  mmcmahon@republicelite.com
Republic Elite LLC
15167 Business Avenue
Addison, TX  75001

**Re:     60-Day Notice of Violations and Intent to File Suit Under the Federal Water
Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of Barbosa
Cabinets, Inc, Republic Elite, LLC; Prologis, LP and Prologis, Inc, a Maryland Corporation:

    This letter is being sent to you on behalf of Central Valley Eden Environmental
Defenders, LLC ("EDEN") to give legal notice that EDEN intends to file a civil action against
Barbosa Cabinets, Inc. ("Discharger" or "Barbosa Cabinets") and its parent company Republic

---

1520 E. Covell Blvd #B5                    Telephone:  (800) 545-7215
Davis, CA  95616                              Email:  admin@edendefenders.org

Elite, LLC; Prologis, LP and Prologis, Inc., the property owners, and the respective corporate officers and other legally responsible parties for violations of the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that EDEN believes are occurring at the Barbosa Cabinets facility located at 2020 E Grant Line Road in Tracy, California ("the Facility").

EDEN is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, sloughs, lakes and tributaries of California, for the benefit of its ecosystems and communities.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and are described in Section II.B, below. Some of EDEN's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for kayaking, canoeing, camping, fishing, duck hunting, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of EDEN's current members has standing to bring suit against Barbosa Cabinets, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific EDEN member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous. As a result, the interests of certain individual EDEN members have been, are being, and will continue to be adversely affected by the failure of Barbosa Cabinets to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the EPA in the state in which the violations occurred or are occurring.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility. After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN reserves the right to file suit in federal court against Barbosa Cabinets under CWA section 505(a) for the violations described more fully below, if this matter cannot be resolved.

## I.      THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of

California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 2014-0057-DWQ as amended by Orders 2015-0122-DWQ and 2018-0028-DWQ) (hereinafter "General Permit").

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that on or around December 6, 2021, Barbosa Cabinets submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the General Permit. Barbosa Cabinets's assigned Waste Discharger Identification number ("WDID") is 5S39I029569.

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, Barbosa Cabinets has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377, et seq; the General Permit; the Regional Water Board Basin Plan; the California Toxics Rule (CTR); 40 Code of Federal Regulations §§122.22, 122.26; 40 C.F.R. Chapter I, Subchapter N, § 400, et seq.; and California Code of Regulations, Title 22, § 64431.

## II.    THE LOCATION OF THE ALLEGED VIOLATIONS

### A.    The Facility

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is Barbosa Cabinets' permanent facility address of 2020 E Grant Line Road in Tracy, California.

Barbosa Cabinets is a facility which manufactures wooden cabinets, engineered kitchen countertops and stone countertops. Facility operations are covered under Standard Industrial Classification Code(s) (SIC) 2434 - Wood kitchen cabinets.

Based on the EPA's Industrial Storm Water Fact Sheet for industrial businesses with the SIC code of 2434, stormwater run-off discharges contain many pollutants on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm, including toxic and heavy metals, pH affecting substances, total suspended solids (TSS), and various types of oil and grease (O&G), as well as Chemical Oxygen Demand (COD), Silica, Formaldehyde, Volatile Organic Compounds (VOCs), Lead, Zinc, Chromium, Chloride, Biological Oxygen Demand (BOD), Sulfur, Zinc, Benzene, Zylene, Styrene, Arsenic and Lead.

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

### B.    The Affected Receiving Waters

The Facility discharges into Old River, a direct tributary of the San Joaquin River in the Southern Portion of the Delta Waterways ("Receiving Waters").  The Facility's Receiving Waters are impaired for Salinity, Group A Pesticides, Chloride, Chlorpyrifos, Diazinon, Dissolved Oxygen, Low Dissolved Oxygen, Mercury, Electrical Conductivity, DDT, Total Dissolved Solids.

The San Joaquin River is a water of the United States.  The CWA requires that water bodies such as the San Joaquin River meet water quality objectives that protect specific "beneficial uses." The Regional Water Board has issued its *Water Quality Control Plan for the Sacramento-San Joaquin Delta Basin* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region.  The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants.  Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

## III.    VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### A.    *Deficient SWPPP and Site Map*

Barbosa Cabinets' current Storm Water Pollution Prevention Plan ("SWPPP") and Site Map uploaded and certified to SMARTS on July 11, 2023, are inadequate and fail to comply with the requirements of the General Permit as specified in Section X of Order No. 2014-0057-DWQ, as delineated below.

Barbosa Cabinets' former SWPPPs and Site Map uploaded and certified to SMARTS on November 30, 2021; and September 6, 2022, are similarly deficient, such that the facility's SWPPP has been continuously deficient since December 6, 2021.

1.    The Site Map does not include all minimum required components for Site Maps as indicated in Section X.E of the General Permit as follows:

(a)  Accurate depiction of non-industrial drainage areas. Specifically, the Site Map improperly designates the entire western and northern portions of the facility as non-industrial.  A drainage area is not non-industrial unless (a) there are no industrial operations occurring in the area; and (b) the discharges in that area are composed entirely of storm water that has not been exposed to industrial materials or activity.

A drainage area (including an employee parking lot) cannot be non-industrial if it receives storm water discharges that have emanated from or passed through an industrial area, including an area where materials are stored outdoors (IGP Sections X.E.3, X.H.1.a.viii and XVII).   A stated herein, industrial activities are conducted in both the western and northern portions of the facility;

(b)  An accurate depiction of all storm water drainage areas within the Facility boundary.  EDEN's investigation confirms there are at least three separate drainage areas at the facility;

(c)  Accurate storm water flow direction of each drainage area;

(d)  At least one sampling location for every drainage area.  EDEN's investigation confirms at least three drainage areas are present at the Facility;

(e)  Sampling points which are representative of facility operations;

(f)  Locations of storm water collection and conveyance systems associated with discharge locations and the accurate flow direction (i.e. storm drain inlets and underground conveyances).  Specifically, at least one drain inlet in the northern portion of the facility is missing from the Site Map, and the underground conveyance system depictions are incomplete, as they do not show any offsite conveyance.

(g)  Municipal storm drain inlets which receive the Facility's industrial storm water discharges and authorized non-storm water discharges (IGP Section X.E.3.a).  EDEN has confirmed there is an MS4 inlet on the north side of E. Grant Line Road which receives stormwater runoff from stormwater emanating from the NW facility entrance, due to lack of BMPs or berms to retain the stormwater;

(h)  All locations where materials are directly exposed to precipitation and the locations where identified significant spills or leaks have occurred;

(i)  All areas of industrial activity subject to the General Permit, including industrial storage areas, storage tanks, shipping and receiving areas, fueling areas, vehicle and

equipment storage/maintenance areas, material handling and processing areas, material and scrap storage areas ("boneyards"), waste treatment and disposal areas, dust or particulate generating areas, cleaning and material reuse areas, cooling towers, and all other areas of industrial activity that may have potential pollutant sources.   Specifically, industrial operations occurring in the west and north portions of the facility have not been depicted on the site map and the locations of the underground and above-ground storage tanks are also not depicted.

2.     The SWPPP does not include all the required elements, as indicated below:

   A.   Certification by an eligible **Legally Responsible Person** (LRP).

         LRP eligibility is limited to the following individuals:

   (1)   A responsible corporate officer (i.e. president, secretary, treasurer or vice-president in charge of a principal business function);

   (2)   The current Manager of the entire facility or the Manager of manufacturing, production or operations for the facility; or

   (3)   A general partner, managing member or facility owner for partnerships, limited liability companies or sole proprietorships.

   Jennifer Blake, the individual who certified the Facility SWPPP as the LRP, is not an eligible LRP pursuant to Section XXI.K.4 of the General Permit. (Sections II.A, II.B, XXI.K, XXI.L) because she is no longer employed by Barbosa Cabinets as the EHS Manager, a position which is now held by Mark McMahon.

   B.   A complete and detailed list of all **Industrial Materials** handled at the facility, including the locations where the materials are stored, received, shipped and handled, and the quantities and handling frequency of the Industrial Materials (Sections X.A.3, X.F, X.G.1.a).

         EDEN's investigation, including a review of industrial materials, chemicals and hazardous waste materials reported to CERS, TRI, RCRA and DTSC confirm the blatant and fraudulent omission of many toxic chemicals from the list of industrial materials.

   C.   A detailed, accurate and complete discussion of **Facility operations and all industrial processes** at the Facility, including manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to each

industrial process; and the type, characteristics, and approximate quantity of
industrial materials used in or resulting from the process. (Section X.G.1.a).

Specifically, as is evidenced by material tracking and leaks of black liquid
material staining the ground, industrial operations are occurring behind multiple
roll-up doors located in the northern portion of the facility.  These roll-up doors
are left open for part or all of each business day.  Loading and unloading also
occurs in this area.  Further, waste and material handling and processing
(including some painting) occurs on the western portion of the facility in an semi-
enclosed area (lacking a roof or cover).

D.   An accurate and complete description of **Potential Pollutant Sources** and
narrative assessment of all areas of industrial activity with potential industrial
pollutant sources, including Industrial Processes, Material Handling and Storage
Areas, Dust and Particulate Generating Activities, Significant Spills and Leaks,
Non-Storm Water Discharges and Erodible Surfaces (Section X.G).

Specifically, the SWPPP omits a potential pollutant source assessment for the
many toxic substances handled at the facility which have been omitted from the
list of Industrial Materials.  Further, the Industrial Materials list in Section 3.2.2
of the SWPPP is utterly lacking in detail, listing only categories of materials and
omits the actual pollutants associated with the materials.

For example, the partial material list in Section 3.2.2 of the SWPPP includes the
categories of "Waste Paint/Stain", "Waste Paint Booth Filters", "Waste Aerosol
Cans", "Waste Rags/Adhesives and "Waste Oil Filters and Absorbants".

Hazardous Waste Manifest forms on file with California's Department of Toxic
Substances Control ("DTSC") confirm large quantities of the following pollutants
associated with the above categories of materials:

Silica, Formaldehyde, Volatile Organic Compounds (VOCs), Lead, Zinc,
Chromium, Chloride, Diazinon, Sulfur, Zinc, Nitrates, Ammonia, Benzene,
Zylene, Styrene, Arsenic and Lead

However, none of these pollutants appear in any portion of Barbosa Cabinets'
SWPPP.

Even more egregious is the fact that Section 3.2.3 (Potential Pollutant Sources) of
the SWPPP clearly states that "metals" are potential pollutants at the Facility, but
fails to include them as additional sampling parameters or even to identify the
manner in which the metals are used or the areas of the facility.  Further, included

as potential pollutants is are vague and categories such as "leaks and spills of liquid materials", "oils", "paints" and "organics". Again, the exact materials and associated pollutants have intentionally been omitted from the SWPPP.

E.  An adequate and accurate discussion of the **Facility's Receiving Waters** and associated impairments (Section XI.B.6.e, Section X.G.2.ix).

Specifically, Section 3.2.4 of Barbosa Cabinets' SWPPP, while accurately listing the Facility's receiving water impairments, **<u>falsely and fraudulently</u>** indicates that none of them are present at the Facility, except for Total Dissolved Solids.

EDEN's investigation confirms that Chloride, Diazinon and Dissolved Oxygen (in the form of COD and BOD) are in fact present at the Facility.

F.  A list of any significant quantities of industrial materials, or any toxic or hazardous chemical that has **spilled or leaked at** the Facility and which has either discharged from the facility's perimeter or had the potential to discharge, within the <u>previous five (5) year period,</u> including a discussion of the location, characteristics, and approximate quantity of the materials spilled or leaked; approximate quantity of the materials discharged; cleanup or remedial actions that have occurred or are planned; and preventive measures to ensure spills or leaks do not reoccur (IGP Section X.G.1.d.ii).

EDEN's investigation confirms that numerous leaks and spills have occurred at the Facility within the prior 5-year period which remain on the ground, as they have not been cleaned up.

G.  An appropriate **Monitoring Implementation Plan**, including an identification of team members assigned to conduct monitoring requirements, a detailed and accurate description of all discharge locations, a discussion of Visual Observation procedures and procedures for field instrument calibration instructions (Section X.I);

H.  A complete and accurate Pollutant Source Assessment and the corresponding proper **sampling parameters** to include all potential pollutants present at the Facility likely to come into contact with stormwater (Section XI.B.6).

Table 1 of the SWPPP lists waste handling and disposal, dust and particulate generating activities and shipping and receiving of materials as industrial activities

with associated pollutants likely to come into contact with stormwater.

As stated, EDEN's investigation confirms these industrial activities are associated with the following pollutants:

Iron, Aluminum, Silica, Formaldehyde, Volatile Organic Compounds (VOCs), Lead, Zinc, Chromium, Chloride, Biological Oxygen Demand (BOD), Diazinon, Sulfur, Zinc, Nitrates, Ammonia, Benzene, Zylene, Styrene, Arsenic and Lead

The SWPPP fails to include these pollutants as **additional sampling parameters**, in violation of Section XI.B.6.c of the General Permit.


I.    An appropriate and complete discussion of **Drainage Areas and Outfalls** from which samples must be taken during Qualified Storm Events (Section X.I).

As indicated, there are three separate and distinct drainage areas as the Facility, including the portion north of the main warehouse building, the western portion and the southern portion.  The SWPPP fails to account for the northern and western drainage areas, or to designate the required additional sampling locations, as there must be at least one sampling location for every drainage area.

In addition, the SWPPP fails to include drainage information for the northern and western drainage areas.

Finally, the drainage information included in the SWPPP is inaccurate, incomplete and misleading, according to information obtained from the City of Tracy with regard to its stormwater management master plan.
Further, the SWPPP does not account for stormwater emanating from both of the facility's entrances (northwestern to E. Grant Line Road, and southwestern to E. Paradise).

J.    Accurate and current information about the Facility's **Pollution Prevention Team.**  Several Pollution Prevention Team members listed in the SWPPP are not currently employed at the Facility or are regional employees not designated to work at this Facility (Section X.D);


Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### B. *Failure to Update SWPPP*

Section X.B of the General Permit provides that all Facilities must revise their on-site SWPPP whenever necessary. Furthermore, all Dischargers are to upload to SMARTS a revised SWPPP within thirty (30) days whenever the SWPPP contains significant revisions; and within ninety (90) days when the SWPPP contains routine revisions.

Barbosa Cabinets was required to update its SWPPP and upload it to SMARTS no later than ninety days after the changes to its Pollution Prevention Team members, but failed to do so.

### C. *Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit*

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1. Failure to Conduct Visual Observations and Maintain Required Records/Reports

Section XI.A of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Section XI.A.3 required all Dischargers to complete contemporaneous records of all visual observations. The records at a minimum must include the date, approximate time of the observation, the locations observed, the presence and probable source of any observed pollutants, the name of the person who conducted the observation, and any response actions and/or additional SWPPP revisions necessary to be taken in response to the visual observations.

Section XXI.H provides that Dischargers must produce copies of visual observation records to regulatory agencies upon request; and Section XXI.J.5 provides that Dischargers must retain either paper or electronic copies of visual observation records for at least five (5) years.

EDEN believes that between January 1, 2022, and the present, Barbosa Cabinets has failed to conduct monthly and sampling visual observations pursuant to Section XI.A of the General Permit and to maintain contemporaneous written Visual Observation Reports confirming that visual observations were conducted.

2.  <u>Failure to Collect and Analyze the Required Number of Storm Water Samples</u>

In addition, EDEN alleges that Barbosa Cabinets has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

Section XI.C.6.b provides that if samples are not collected pursuant to the General Permit, an appropriate and accurate explanation must be included in the Annual Report.

As of the date of this Notice, Barbosa Cabinets has failed to upload into the SMARTS database system the required number of storm water run-off sample analyses for the reporting years 2021-22 and 2024-25 and has not provided an adequate explanation for its failure to do so.

Barbosa Cabinets obtained NOI General Permit coverage on December 6, 2021, after previously (and fraudulently) obtaining NEC coverage.  Barbosa Cabinets was required to immediately begin collecting stormwater samples, but failed to do so until September 19, 2022.

In addition, Barbosa Cabinets missed collecting four stormwater samples during the 2024-25 reporting year.

3.  <u>Failure to Collect Storm Water Run-Off Samples during Qualified Storm Events</u>

Pursuant to Section XI.B.1 of the General Permit, a Qualified Storm Event (QSE) is a precipitation event that both produces a discharge for at least one drainage area at the Facility and is also preceded by 48 hours with no discharge from any drainage area.

Barbosa Cabinets's stormwater runoff sample(s) collected as listed below were not collected during Qualified Storm Events as defined by the General Permit:

| Sample Date |
|---|
| 1/4/2023 |
| 12/20/2023 |
| 1/22/2024 |
| 2/7/2024 |

4. <u>Failure to Deliver Storm Water Samples to a Laboratory within 48 Hours of Collection</u>

    Pursuant to General Permit Section XI.B.8, referring to Attachment H to the General Permit, Dischargers must deliver storm water runoff samples to a qualified Laboratory within 48 hours of the date and time of physical sampling. Barbosa Cabinets's storm water runoff samples listed below were not delivered to the Facility's Laboratory California Laboratory Services in that time frame:

| Sample Date | Date Laboratory Received Sample |
|---|---|
| 12/21/2022 | 12/5/2022 |
| 2/3/2023 | 2/8/2023 |

5. <u>Failure to Collect Samples From Each Drainage Area at all Discharge Locations</u>

    Section XI.B.4 of the General Permit requires Dischargers to collect samples from all discharge locations at all drainage areas, regardless of whether the discharges are substantially similar.

    The General Permit defines "drainage area" as the "area of land that drains water, sediment, pollutants, and dissolved materials to a common discharge location." (Attachment C to General Permit-Glossary)

    EDEN's investigation confirms that there are at least three drainage areas with a minimum of three discharge/sampling locations at the Facility which are not depicted on the Site Map, nor are they discussed in the SWPPP.

The storm water runoff sample analyses Barbosa Cabinets uploaded for samples collected on the dates listed below failed to include samples from all discharge locations at the Facility:

| |
|---|
| 9/19/2022 |
| 11/1/2022 |
| 11/8/2022 |
| 12/1/2022 |
| 1/4/2022 |
| 2/3/2023 |
| 2/24/2023 |
| 11/18/2023 |
| 12/20/2023 |
| 1/22/2024 |
| 2/7/2024 |
| 12/27/2024 |
| 2/4/2025 |
| 2/13/2025 |

6. <u>Failure to Analyze Storm Water Samples for All Required Parameters</u>

General Permit sections XI.B.6.a and XI.B.6.b require all Dischargers to analyze for the following three parameters, regardless of facility type: pH, Total Suspended Solids (TSS) and Oil & Grease (O&G).

Section XI.B.6.c of the General Permit requires Dischargers to analyze for any additional parameters on a facility-specific basis that serve as indicators of the presence of all industrial pollutants.

EDEN's investigation confirms that the following additional parameters must be included in the Facility's sampling process, as they are associated with Barbosa Cabinets's industrial operations and are likely to commingle with stormwater: Iron, Aluminum, Silica, Formaldehyde, Volatile Organic Compounds (VOCs), Lead, Zinc, Chromium, Chloride, Biological Oxygen Demand (BOD), Diazinon, Sulfur, Zinc, Nitrates, Ammonia, Benzene, Zylene, Styrene, Arsenic, Lead.

Section XI.B.6.e of the General Permit also requires Dischargers to analyze for any additional applicable industrial parameters related to receiving waters with 303(d) listed impairments.

Furthermore, If a Receiving Water Limitation pollutant is present in any manner at a facility, the Discharger must test its stormwater for that pollutant, regardless of whether the

pollutant may come into contact with storm water.  (See industrial General Permit Fact Sheet, Section II.J.3.b.3, at p.170)

EDEN's investigaton confirms the following receiving water parameters are present at the facility in its industrial chemicals and materials:  Chloride, COD, BOD and Diazinon.

The storm water runoff sample analyses Barbosa Cabinets uploaded for samples collected on the dates listed below failed to include all required additional sampling parameters as outlined above.

| |
|---|
| 9/19/2022 |
| 11/1/2022 |
| 11/8/2022 |
| 12/1/2022 |
| 1/4/2022 |
| 2/3/2023 |
| 2/24/2023 |
| 11/18/2023 |
| 12/20/2023 |
| 1/22/2024 |
| 2/7/2024 |
| 12/27/2024 |
| 2/4/2025 |
| 2/13/2025 |

### D.  *False Annual Reports and SWPPP/Site Map*

Section XXI.L of the General Permit provides as follows:

### L. Certification

Any person signing, certifying, and submitting documents under Section XXI.K above shall make the following certification:

*"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are*

*significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

Barbosa Cabinets has failed to comply with Sections XVI.A, XXI.L and XXI.N of the General Permit by submitting and certifying to SMARTS as true and correct Annual Reports for the reporting years 2021-22, 2022-23, 2023-24 and 2024-25, which contained objectively false information with respect to whether receiving water parameters were present at the Facility.

Furthermore, on July 11, 2023, Barbosa Cabinets' legally responsible person certified and submitted to SMARTS the facility's SWPPP and Site Map that as detailed above contains multiple false and fraudulent statements.

### E.  *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that Barbosa Cabinets has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges.  Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

Barbosa Cabinets's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

EDEN has recently observed the facility and obtained evidence of the following ongoing BMP deficiencies:

Material tracking; drain inlets with no visible BMPs; large dark, oily spills emanating from five loading dock roll-up doors which are open during the day; rust stains on ground at loading dock; broken wooden pallets and wood waste on ground outdoors in southern portion of facility; four uncovered waste bins; dark roof discharge stains; metal industrial materials stored outdoors directly on the ground; and no BMPs implemented at either facility entrance to control off-site discharge or material tracking

### F.  *Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States.  Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

### 1.  Discharges in Excess of Technology-Based Effluent Limitations

The Industrial General Permit includes technology-based effluent limitations, which prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of best available technology economically achievable ("BAT") for toxic pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants.  (General Permit, Section X.H.)

The EPA has published Benchmark values set at the maximum pollutant concentration levels present if an industrial facility is employing BAT and BCT, as listed in Table 2 of the General Permit.  The General Permit includes "Numeric Action Levels" ("NALs") derived from these Benchmark values; however, the NALs do not represent technology-based criteria relevant to determining whether an industrial facility has implemented BMPs that achieve BAT/BCT. (General Permit, Section I.M. (Finding 62)).

Barbosa Cabinets' exceedances of Benchmark values identified in the table listed below, indicate that it has failed and is failing to employ measures that constitute BAT and BCT, in violation of the requirements of the Industrial General Permit.   EDEN alleges and notifies Barbosa Cabinets that its storm water discharges from the Facility have consistently contained and continue to contain levels of pollutants that exceed Benchmark values as listed below.

These allegations are based on the Facility's self-reported data submitted to the Regional Water Board.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an

exceedance of a permit limitation." *Sierra Club v. Union Oil,* 813 F.2d 1480, 1492 (9th Cir. 1988).

Barbosa Cabinets' ongoing discharges of storm water containing levels of pollutants above EPA Benchmark values and BAT- and BCT-based levels of control also demonstrate that it has not developed and implemented sufficient BMPs at the Facility. EPA Benchmarks are relevant to the inquiry as to whether a facility has implemented BMPs. [*Cal. Sportfishing Prot. Alliance v. River City Waste Recyclers, LLC* (E.D.Cal. 2016) 205 F.Supp.3d 1128; *Baykeeper v. Kramer Metals, Inc.* (C.D.Cal. 2009) 619 F.Supp.2d 914, 925; *Waterkeepers Northern California v. AG Industrial Mfg. Inc.* (9th Cir. 2004) 375 F.3d 913, 919 (concentration levels in excess of EPA benchmarks are evidence supporting the citizen plaintiff's contention that defendant did not have appropriate BMPs to achieve BAT/BCT).]

Barbosa Cabinets' failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

**2.**   Discharges in Excess of Receiving Water Limitations

In addition to employing technology based effluent limitations, the Industrial General Permit requires dischargers to comply with Receiving Water Limitations. Receiving Water Limitations found in Section VI of the General Permit prohibit storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment.

Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment also constitute violations of the General Permit Receiving Water Limitation.

Applicable Water Quality Standards ("WQS") are set forth in the California Toxics Rule ("CTR") and the Regional Basin Plan. Exceedances of WQS are violations of the Industrial General Permit, the CTR, the Basin Plan, any parameter included as an impairment for the Facility's Receiving Waters on the 303(d) listing, and any parameters identified by the Regional Water Board as parameters assigned a total maximum daily load (TMDL).

Industrial storm water discharges must strictly comply with WQS, including those criteria listed in the applicable Basin Plan. (See *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).)

The Basin Plan establishes WQS for the San Joaquin River and its tributaries, including but not limited to the following:

• Waters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses.

• Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

• Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.

• All waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms.

• Surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.

Information available to EDEN indicates that the Facility's storm water discharges contain elevated concentrations of specific pollutants, as listed below. These polluted discharges can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Receiving Waters. Discharges of elevated concentrations of pollutants in the storm water from the Facility also adversely impact human health. These harmful discharges from the Facility are violations of the General Permit Receiving Water Limitation.

The following discharges of pollutants from the Facility have violated Discharge Prohibitions of the General Permit and are evidence of ongoing violations of Effluent Limitations:

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| 9/22/2022 | SW1 | COD | 325 |
| 11/2/2022 | | TSS | 110 |
| 12/5/2022 | | COD | 218 |
| 2/24/2023 | | TSS | 150 |
| 12/22/2023 | | COD | 260 |
| | | | |

*All units are listed in milligrams per liter (mg/L), except pH, which is listed in pH units (SU)

Listed below are the EPA Benchmark numeric action levels associated with the parameters, as identified on *Table 2 of the General Permit,* as well as the Maximum Contaminant Levels

(MCLs) listed in the *California Code of Regulations, Title 22, Section 64431* (Table 64431-A) and the Water Quality Control Plan *(Basin Plan)* for the *California Regional Water Quality Control Board, Central Valley Regional, Fifth Edition* (Revised May 2018), Basin Plan Table 3-1, Trace Element Water Quality Objectives.

| Parameter | EPA Benchmark Annual NAL | EPA Benchmark NAL instantaneous Value | CV BASIN PLAN Table 3-1 MCL value | CCR Title 22 Section 64431 |
|---|---|---|---|---|
| pH | N/A | >6 or <9 SU | >6.5 or >8.5 | N/A |
| Total Suspended Solids (TSS) | 100 mg/L | 400 mg/L | N/A | N/A |
| Oil & Grease | 15 mg/L | 25 mg/L | N/A | N/A |
| Zinc | .26 mg/L | N/A | .10 mg/L | N/A |
| Copper | .0332 mg/L | N/A | .0056 mg/L | N/A |
| Lead | .262 mg/L | N/A | N/A | .05 mg/L |
| Chemical Oxygen Demand (COD) | 120 mg/L | N/A | N/A | N/A |
| Biochemical Oxygen Demand (BOD) | 30 mg/L | N/A | N/A | N/A |
| Aluminum | .75 mg/L | N/A | N/A | 1.0 mg/L |
| Iron | 1.0 mg/L | N/A | .30 mg/L | N/A |
| Nitrate + Nitrate Nitrogen | .68 mg/L | N/A | N/A | 45 mg/L |
| Phosphorus | 2.0 mg/L | N/A | N/A | N/A |
| Ammonia | 2.14 mg/L | N/A | N/A | N/A |
| Magnesium | .064 mg/L | N/A | N/A | N/A |
| Arsenic | .064 mg/L | N/A | N/A | N/A |
| Cadmium | .0053 mg/L | N/A | .00022 mg/L | .01 mg/L9i |
| Nickel | 1.02 mg/L | N/A | N/A | N/A |
| Mercury | .0014 mg/L | N/A | N/A | N/A |
| Selenium | .005 mg/L | N/A | N/A | N/A |
| Silver | .0183 mg/L | N/A | .01 mg/L | .05 mg/L |

### G.  *Failure to Properly Train Employees/Facility Pollution Prevention Team*

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the

General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

Barbosa Cabinets has failed to comply with numerous standard conditions of the General Permit as outlined above and has failed to retain a QISP to trains its Pollution Prevention Team after entering Level 1 status, in violation of General Permit Section XII.

Based on the foregoing violations, it is clear that Barbosa Cabinets has either not properly established its Pollution Prevention Team, or has not adequately trained its Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

Barbosa Cabinets may have had other violations that can only be fully identified and documented once discovery and investigation have been completed.  Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

## IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are Barbosa Cabinets, Inc; Republic Elite, LLC; Prologis, LP, and Prologis, Inc., a Maryland corporation, as well as the respective corporate officers and employees of the Facility responsible for compliance with the CWA.

## V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is December 6, 2021, to the date of this Notice.  EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

60-Day Notice of Intent to Sue
Barbosa Cabinets
July 26, 2025
Page 21 of 22

## VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is:

Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215

The attorney assigned to this matter is:

Adam D. Brumm, Esq.
Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215, extension 906
Email:  adam@edendefenders.org

**To ensure an expedited response to this Notice, please send all initial communications to the following email address:**  responses@edendefenders.org.

## VII.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  **These provisions of law currently authorize civil penalties of <u>$57,617.00 per day, for each violation occurring on or after November 2, 2015</u>.**

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

Lastly, pursuant to 33 U.S.C. § 1365(d), EDEN will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred in this matter.

## VIII.    CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages Barbosa Cabinets's counsel to contact EDEN within 20 days of receipt of this Notice by sending an email to responses@edendefenders.org to initiate a discussion regarding the violations detailed herein and to determine how Barbosa Cabinets may resolve this matter without the necessity of litigation.

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if Barbosa Cabinets wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.

If EDEN does not receive a response from Barbosa Cabinets's counsel before the expiration of the 60-day notice period, this matter will be transferred to EDEN's litigation counsel.  Thank you.

Sincerely,

*EDEN Environmental Defenders*

Copies to:

Lee M. Zeldin, Director, U.S. Environmental Protection Agency, zeldin.lee@epa.gov
Regional Administrator, U.S. EPA – Region 9
Sarah Rowan:  rowan.sarah@epa.gov  and Laurie Kermish:  kermish.laurie@epa.gov
Mayumi Okamoto, State Water Board Office of Enforcement:  Mayumi.Okamoto@waterboards.ca.gov
California Water Boards Stormwater Program, stormwater@waterboards.ca.gov
Javier Orozco, State Water Resources Control Board, Javier.orozco@waterboards.ca.gov